THE STATE, HENRY F. FELIX, PROSECUTOR, v. THE CITY COUNCIL OF ATLANTIC CITY.

1. Atlantic avenue, in Atlantic City, although the Camden and Atlantic Railroad runs longitudinally over said avenue, opposite the lands of the prosecutor, is a public street within the meaning of the city charter, the same having been dedicated to the public before the building of said railroad, and the city council may, by ordinance, direct and

order the grading, graveling, and curbing of said avenue, in front of the owners on either side, at their expense.

2. The railroad at the place in dispute is but an incident to the street, which is the main thoroughfare of the city.

3. Various objections to the validity of the ordinance brought up in this case considered and overruled.

4. What shall constitute laches.

On *certiorari* to remove and set aside an ordinance of the city council of Atlantic City.

The points made by council are given in the opinion of the court.

For prosecutor, *P. L. Voorhees.*

For defendant, *E. Merritt.*

SCUDDER, J.    The controversy in this cause relates to the grading, graveling, and curbing of Atlantic avenue, in Atlantic City, done by the ordinance and authority of the city council, in front of lands of the prosecutor lying on both sides of said avenue.

The avenue is one hundred feet in width, consequently the expense of said work ($1,570.56) is considerable, and much earnestness was shown by the respective counsel to maintain and to avoid the charge.

The case is also complicated by the fact that the Camden and Atlantic Railroad runs longitudinally over said avenue, opposite the lands of the prosecutor, and it was contended that the avenue was not a public street, but the road-bed of the railroad—a private way, which the prosecutor could not be required to grade. It is a peculiar feature of this city that the railroad runs down the middle of the main street, and the principal boarding-houses, shops, and many dwellings are built upon it. In the bathing season, passengers leave the cars opposite their boarding places by this convenient arrangement.

I will consider the several questions raised in their order. It was argued that the *certiorari* should be set aside, because the ordinance requiring the avenue to be graded was passed October 25th, 1859, and the writ was not issued until June 30th, 1865. But the writ was not directed to the removal of the ordinance only. A subsequent resolution, passed in 1864, and all the proceedings for grading, graveling, and curbing, were also required to be certified to this court, and there was no attempt at grading in front of the prosecutor's lands by city authority until about the time the writ was allowed. As there had been so great delay on the part of the city in enforcing this ordinance, and the plaintiff may have been misled thereby, I cannot say that there was want of diligence in prosecuting this writ of *certiorari* sufficient to induce the court to dismiss upon the argument of the cause. See *State* v. *Council of Newark*, 1 *Vroom* 303, *and cases there cited*.

It was also urged that there was laches in not procuring a due return of the writ, and for this reason it should be dismissed. The writ was returnable November Term, 1865, but was not returned until February Term, 1869. Here was undoubtedly great delay, and the court might, if a motion had been made in proper time, or even upon its own motion, at the hearing, dismiss the writ. The defendants, however, cannot now object, when, by their own acts, they have assented to the delay. This appears by the affidavits in this cause, the last being taken on the part of the defendants, February 20th, 1869, four days before the return of the writ.

The many reasons assigned for setting aside the ordinance and the proceedings brought up, so far as they affect the prosecutor, may be considered under several general heads.

The ordinance is entitled "An ordinance to grade, gravel, and curb Atlantic avenue, from Michigan avenue to the inlet," passed October 25th, 1859, by the city council of Atlantic City. In the first section it is ordained "that all owners of real estate fronting on any part of Atlantic avenue, between Michigan avenue and the inlet in said city, be and they are

hereby required, within sixty days from and after the passage of this ordinance, to grade, curb, and gravel the said Atlantic avenue, in front of his, her, or their property," &c., giving the material, form, and dimensions.

Section second relates to the sidewalks.

Section third ordains " that if any owner or owners as aforesaid shall neglect to comply with the first and second sections of this ordinance, then it shall be the duty of the city authorities to cause said work to be done at the expense of his, her, or their property in front of which said work shall be done."

Section four enacts " that all the above work shall be done under the direction of the city surveyor, and to the satisfaction of the committee on streets of said city."

The lands of the prosecutor lie within the points named in the ordinance. The owner did not grade, curb, and gravel said avenue in front of his property within sixty days from and after the passage of the ordinance, or at any other time, but the work was done by the city in the months of April and May, 1865.

It does not appear by the papers or testimony in the cause that anything has been done to collect the above sum from the prosecutor, or to make it from his lands, nor has any assessment been sent up. It was not denied upon the argument that the common council had the authority under the charter to pass such an ordinance. Such power is expressly given in §§ 13, 24, and 25, *Laws* 1854, *p.* 284–292, and the validity of similar ordinances has been recognized in this state and elsewhere. *Paxson* v. *Sweet*, 1 *Green's R.* 196 ; *City of Lowell* v. *Hadley*, 8 *Metc.* 180 ; *State* v. *Dean*, 3 *Zab.* 335 ; *State* v. *New Brunswick*, 3 *Vroom* 548.

The principle of assessment for benefits is well settled in many cases. But it is insisted that Atlantic avenue in front of the prosecutor's lands is not a public street, but the private property of the Camden and Atlantic Railroad Company, and therefore the common council had no power to compel the owner of said real estate, by ordinance, to grade,

curb, and gravel the avenue along and opposite to his property. If the fact were so, it might present a question differing in principle from *State* v. *New Brunswick*, 3 *Vroom* 548, which relates to a turnpike road lying within the city limits.

To this, however, it might be answered that this avenue was *de facto* a street, and sufficiently in use by the public, and for such time as would induce the court to refuse to investigate this question collaterally. *State* v. *Jersey City*, 1 *Vroom* 521 ; *State* v. *Jersey City*, 5 *Dutcher* 441.

But I am satisfied, from a careful examination of the exhibits and testimony in this cause, that the railroad at the place in controversy is but an incident to the street, which is the main thoroughfare of the city.

By their charter, approved March 19th, 1852, the Camden and Atlantic Railroad were authorized to survey, lay out, and construct a railroad " from the city of Camden, in the county of Camden, or from within one mile of said city, to be determined on by said company, to run through the counties of Camden and Atlantic to the sea, at or near Absecom inlet, in said county of Atlantic, not exceeding one hundred feet in width."

The direct course of the road, running southeasterly, entered Atlantic City, and, as originally laid, stopped at the northerly side of Atlantic avenue, between North Carolina and South Carolina avenues, where the depot is now situated, east of the premises in controversy. It is admitted that a train of cars ran into this terminus July 4th, 1854. In 1858, a Y was made, beginning about the distance of a block north of Atlantic avenue, running southwesterly to strike Atlantic avenue near the Surf House, and thence northeasterly in the middle of Atlantic avenue, passing the depot, up towards the inlet. It appears that the owners of lands on Absecom beach, among them Richard Hackett, then owner of the land now held by the prosecutor, signed a paper, which is lost, and the exact purport of which is not shown, giving a right of way to said railroad company, and upon this they appear to have acted in laying their road at this point, and in making the

Y track above mentioned. No other title or authority is shown. March 10th, 1853, the principal corporators in the Camden and Atlantic Railroad formed another association, and were incorporated by the name of "The Camden and Atlantic Land Company." The preamble of their charter sets out "that they are interested in the Camden and Atlantic Railroad, and own certain tracts of land, and have contracted to purchase other tracts, situate in the counties of Camden and Atlantic, on and near the route of the said railroad, and also on Absecom beach, in the county of Atlantic, at the terminus of said railroad, which they intend to divide into suitable building and other lots, and to sell and dispose of the same for the benefit of the association, with the object as well of erecting a town and watering place on Absecom beach, as also of improving the country through which the said railroad is located and intended to pass," &c.

December 20th, 1852, a map or plot of Atlantic City was made by the Camden and Atlantic Land Company, and other owners of lands within the boundaries, and by an agreement between the parties, dated April 15th, 1853, was formally adopted, and a dedication of the streets and alleys thus laid down was made for public use. This map and agreement were recorded in the clerk's office of Atlantic county, May 23d, 1854.

March 3d, 1854, Atlantic City was incorporated according to the boundaries of said map. In describing these boundaries, Atlantic street is expressly named as one of the streets of said city, and a line run parallel with its course. These facts settle the question of the recognition by municipal authority of the dedication of this street or avenue, concerning which much was said on the argument of the cause.

The railroad, the land association, and the laying out and incorporating a city for a watering place, were all parts of a scheme directed by the same persons to the same ends. All the acts done in furtherance of these objects were concurrent and consistent. There is no evidence in this cause of exclusive right or ownership in the railroad company to the part

of Atlantic avenue in controversy. The dedication of the street to public use antedates the occupation and use by the railroad company at this point. All the circumstances show that there is no conflict of right or authority between the company and the city, and that the owner of the land at that time assented to the use of the street by the public and by the railroad company.

Whatever question there might be as to the right of exclusive use by the railroad company of a public highway, by legislative and municipal authority, without the consent of the owner of the fee, or compensation made to him, there can be no question that there may be a concurrent use of a public highway by the consent and license of all the parties in interest.

*Morris & Essex Railroad* v. *City of Newark*, 2 *Stockt.* 352; *Williams* v. *New York Central Railroad*, 16 *N. Y.* 97; 1 *Redfield on Railways* 162.

Atlantic avenue is therefore a public street within the terms of the charter; and the common council could require it to be graded, curbed and graveled as such by ordinance.

It was further alleged that the proper formalities have not been observed in passing and enforcing the ordinance. In the first place, that a majority in value of the landholders along said street did not petition for said ordinance, pursuant to the twenty-fourth section of the charter. *Laws* 1854, *p.* 293. The only ground for this objection is, that the petition itself is not produced. The preamble of the ordinance states that there was such petition. The clerk of the common council says that he has made diligent search for it and cannot find it among the city papers, and that it is lost. An entry on the minutes of council shows that such petition was presented prior to the passage of the ordinance. The clerk, several members of council at that time, and property owners on the street, have been examined, and all state that there was a petition signed in due form, as stated in the minutes and ordinance. This is certainly sufficient proof of compliance with the terms of the charter in this respect.

Again, it is said that it is not shown that the ordinance was set up in five public places in said city, for the space of three weeks, under the thirteenth section of the charter. The clerk of the city at that time states that it was his duty and his custom to set up ordinances in the manner prescribed by the charter. The sixteenth section of the charter, however, cures any defect in proof, if any there be, in this particular. It enacts "that the publication of the said ordinances and by-laws in at least five public places in said city, according to law, shall in all cases be presumed to have been made until the contrary shall be made to appear." The burden of proof is therefore on the prosecutor, and he has offered no testimony on this point.

It is also alleged that no notice was served on Henry F. Felix, the prosecutor, pursuant to the proviso in the twenty-fifth section of the charter, which requires "that if any owner or owners of lots or real estate shall not reside in the city at the time when the said work is required to be done, then it shall be the duty of the city council, before they proceed to do, or have the same done, to cause a written notice to be sent to such owner or owners, or reputed owners thereof, setting forth the street wherein the property is situate, and that unless the said owner or owners shall comply with said ordinance, and perform the said work within sixty days from the date of said notice, the city council will cause the same to be done at his, her, or their expense, as the case may be."

At the time that this ordinance was passed and the work therein required to be done, in 1859, Patrick O'Reilly owned these premises, and afterwards conveyed them to his brother-in-law, Henry F. Felix, the prosecutor, by deed dated January 14th, 1861. Both parties claim their residence in Reading, Pennsylvania, at the time the ordinance was passed and since. It appears, however, that O'Reilly was one of the contractors in building the railroad and in clearing and laying out streets; that he boarded and worked in Atlantic City altogether, or much of the time, until after the curbing

and grading were done by the city, and it is questionable, under the evidence, if he was a non-resident.    It is also shown that he had actual notice of the ordinance when it was passed ; promised to curb, grade, and gravel the street, and was indulged, at his own request, from the passage until the work was done; that he was the reputed owner of the property when the work was done in 1865, and the agent of Felix, in charge of this property after the conveyance was made to him, acting in all respects as if it were his own. The charter could not intend, under these circumstances of due publication of the ordinance, actual notice received by the owner, and a promise by him to perform, with such indulgence as was shown, and continuing agency; that the city officers should watch the transfers of property down to the time the work was done by them, and hunt up the successive owners wherever they might be, out of the state, for the purpose of sending written notices to them, and making strict proof of service.    Such requirement would be practically a great hindrance to public improvements, and afford abundant opportunity for fraud, evasion, and imposition. The owner in this case must be charged with legal notice of this ordinance.

Neither, in my opinion, is the situation of the case changed by the fact that on April 25th, 1864, the common council, by resolution, directed the street committee to notify the property owners on the street to commence grading, curbing, and graveling within two weeks after notice, and in default thereof that the city would proceed.    All that was necessary under the charter and ordinance had been done before, and it is immaterial that the time was shorter than therein prescribed.    This resolution was a mere courtesy to the owners, upon the formalities of which they could not insist.    It was not a new or supplementary ordinance, but a call on them to act promptly.

The charter further requires that the city council appoint one or more discreet and skillful persons to superintend the work and prescribe the manner in which the same should be

performed. They appointed the work to be done under the direction of the city surveyor, and to the satisfaction of the committee on streets of said city. They also contracted the work by public proposal to the lowest bidder. This was fair, and in conformity with the charter. There is, therefore, nothing in the objection to the manner of doing the work.

The last reason assigned is, that the city council did not cause a particular statement and account of the expenses of this work to be filed with the city clerk. This is directed to be done by the twenty-fifth section, after the work is finished; and in case of suit brought for the amount of the expense paid by the city, said statement or account filed as aforesaid, with the proof of the amount paid, shall be conclusive evidence for the plaintiff. By this section, also, the lien upon the land attaches from the time of performing the work. Whether, under this phraseology, the requirement is merely directory or for the convenience of proof, or whether it may be done at any time before the claim is enforced, it is not necessary to determine, because no action appears to have been taken by the city authorities since the work was done.

The papers sent up show nothing more than that the work was contracted and done under the authority and direction of the common council, and cost the amount above mentioned.

The point raised is, therefore, now immaterial.

Having thus considered the several reasons assigned by the plaintiff for setting aside the ordinance and proceedings thereon, so far as the same affect his lands lying on Atlantic avenue, the conclusion arrived at is, that the ordinance and proceedings thereon, so far as they appear before us, are affirmed.

BEDLE and WOODHULL, Justices, concurred.